J. Franklin EASTERLING and Erma
Easterling, Plaintiffs,

v.

The CITY OF GLENNVILLE, Harry
Sands, Archie Phillips, Dennis Langley,
Ronnie "Chip" Fincher, and Howard
Gray, Defendants.

No. CV485–483.

United States District Court,
S.D. Georgia,
Savannah Division.

July 11, 1986.

Charles M. Jones, Hinesville, Ga., for plaintiffs.

Joseph P. Brennan, Joseph A. Mulherin, III, Savannah, Ga., for defendants.

ORDER

EDENFIELD, District Judge.

Before the Court is Defendants' Motion for Summary Judgment.

I. *Background*

This action, brought pursuant to 42 U.S.C. § 1983, arises out of the death of Lindy Boy Easterling. His car left the road and struck a tree while he was being pursued by officers of the City of Glennville Police Department. Plaintiffs are the parents of the deceased. The City of Glennville is a municipal corporation located in Tattnall County, Georgia. Defendant Harry Sands was at all times relevant hereto the Chief of Police of the City of Glennville. Defendants Archie Phillips, Dennis Langley, Ronnie "Chip" Fincher, and Howard Gray were at all times relevant hereto police officers for the City of Glennville. Plaintiff sued each of the officers in his individual and official capacity.[1]

The facts surrounding the events of the early morning hours of May 5, 1985 are hotly disputed. Therefore, the Court is mindful that summary judgment should be entered only if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. Rule 56(c); *Clemens v. Dougherty County, Georgia,* 684 F.2d 1365, 1368 (11th Cir.1982); *Casey Enterprises v. American Hardware Mutual Ins. Co.,* 655 F.2d 598, 601–02 (5th Cir. Unit B 1981). The party seeking summary judgment bears the burden of demonstrating that there is no actual dispute as to any material fact and that only legal conclusions remain. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Mercantile Bank & Trust Co. Ltd. v. Fidelity and Deposit Co.,* 750 F.2d 838 (11th Cir.1985). The evidence must be viewed in a light most favorable to the party opposing the motion for summary judgment. *Blackston v. Shook & Fletcher Insulation Co.,* 764 F.2d 1480, 1482 (11th Cir.1985). "All reasonable inferences arising from the undisputed facts should be made in favor of the nonmovant ... but an inference based on speculation and conjecture is not reasonable." *Id.*

1. Plaintiffs originally named as defendants police officers Don Dasher and Al Allen, Glennville Mayor Charles Rowland, and City Councilmen Reese Grimes, Brent Walker, Charles Swindell, and Jessie Rhodes. These parties were dismissed under Fed.R.Civ.P. 41 pursuant to a court order entered June 13, 1986.

Defendants, in their motion for summary judgment, contend the following facts to be uncontroverted. In the early morning hours of May 5, 1985, Officer Archie Lee Phillips, parked near the intersection of Highways 144 and 301 in Glennville, observed a vehicle, only later discovered to have been driven by the decedent, traveling through downtown Glennville east on Highway 144 at a rate of speed well in excess of posted speed limits. (Phillips Dep. pp. 5–6). Officer Phillips began following this vehicle east on Highway 144 towards the local National Guard Armory, at which the high school prom was in progress.

At the time, Officer "Chip" Fincher of the Glennville police force was approaching the National Guard Armory east on Highway 144 ahead of the speeding vehicle in the same direction and lane in which the vehicle was traveling. (Phillips Dep. p. 6; Fincher Dep. pp. 7–8). As Officer Fincher was attempting to turn across the westbound lane of Highway 144 into the east driveway of the National Guard Armory, the Easterling vehicle sped around him on the left side (westbound lane) of the road over a yellow line. (Fincher Dep. pp. 7–9). Fincher had to "slam" on his brakes to avoid being hit by the vehicle as it passed him on the left at a very high rate of speed. (*Id.* at 8). At this point, Fincher turned on his siren and blue lights and began pursuit. (*Id.* at 9). However, the Easterling vehicle refused to stop and continued out of town at a high rate of speed. (*Id.* at 9–10).

Approximately three miles into the chase, the Easterling vehicle applied its brakes as it passed a side road off of Highway 144 (the side road being known as Sand Hill Road or the Time Saver Road), backed up, and turned on to this side road. Officer Fincher had to brake suddenly and maneuver around the Easterling vehicle to the left side in order to avoid hitting it. (*Id.* at 10–11). As Officer Fincher was attempting to back his vehicle up to proceed down the Sand Hill Road, Officer Phillips came by him, turned on to Sand Hill Road, and was, at this point, the lead vehicle in the pursuit. Shortly thereafter, Officer Fincher overtook and passed Officer Phillips and again became the lead police vehicle. (Phillips Dep. pp. 8–10; Fincher Dep. pp. 10–12).

The previously described Sand Hill Road ends at Highway 196 in Long County, Georgia, by a Time Saver Food Store. At this point, the Easterling vehicle turned west on to Highway 196 toward U.S. Highway 301, heading back toward the city limits of Glennville. (Fincher Dep. pp. 12–13). By this time, two other Glennville police officers, Al Allen and Howard Gray, had positioned themselves opposite each other on either side of Highway 196 at a point ahead of the Easterling vehicle in the direction in which it was traveling; both cars were off the road. (Al Allen Dep. pp. 6–8; Howard Gray Dep. pp. 12–14). The Easterling vehicle sped by the two parked police cars without stopping. (Allen Dep. pp. 6–8; Gray Dep. pp. 12–14). There was ample room for the Easterling vehicle to pass the two police cars as they were not yet forming a roadblock. The officers stated that they had just received the radio transmission that the car would be coming down the road and only had time to pull over when the vehicle sped by them. (Allen Dep. pp. 6–8; Gray Dep. pp. 12–14).

After the Easterling vehicle passed the two parked police cars on Highway 196, it continued back toward Highway 301 and the city limits of Glennville, Georgia. The Easterling vehicle reached the end of Highway 196 where it forms a "T" with Highway 301 at a place at or about a southern portion of the city limits of Glennville, turned right onto Highway 301, and headed directly back into the middle of downtown Glennville at a very high rate of speed. (Fincher Dep. pp. 13–14). The driver then proceeded to run the red light at the intersection of Highways 301 and 144, the spot where he was initially observed speeding through town (*id.* at 15), and turned right on to the Hencart Road. (*Id.* at 16). The pursuit ended shortly thereafter when, as the Easterling vehicle continued to travel up the Hencart/Beard's Creek Church Road, it attempted to negotiate a fairly sharp turn. (*Id.* at 17). The vehicle apparently could not make the turn, ran off the

road, and hit a tree.[2] The impact killed Lindy Boy Easterling instantly. When he attempted to negotiate the curve as above described and hit the tree, there were no members of the Glennville Police Department within visual contact of his vehicle. (*Id.* at 17–18). The last thing Officer Fincher (the lead and closest vehicle) saw before the crash as he headed up Hencart Road following the Easterling vehicle was its tail lights in the distance as it pulled away from him and went over a hill. (Fincher Dep. p. 17).

Defendants point out that all the officers testified in their depositions that the identity of the driver of the speeding vehicle was not known for certain until after the vehicle crashed. (Fincher Dep. pp. 6–9; Phillips Dep. pp. 5, 14; Gray Dep. p. 14; Langley Dep. pp. 9–10; Allen Dep. p. 10; Dasher Dep. p. 5). Defendants also assert that the evidence shows that the deceased came speeding through Glennville with no intention of stopping if he were chased by the police. They cite to the deposition of Adrian Blocker, which reveals that Easterling had been given a traffic citation by Officer Fincher on the Thursday night prior to the prom for "laying drag," and that he was upset. (Blocker Dep. pp. 23–28). Further, testimony of John Durrence, a friend of the deceased, reveals that Easterling had said, "[H]e wouldn't stop for [the police] no more...." (Durrence Dep. pp. 17–18).

Plaintiffs controvert the facts as outlined by defendants. They begin their version of the facts by reciting events which occurred prior to the night in question. Approximately two weeks before the accident, Lindy Boy Easterling was leaning up against an automobile owned by Adrian Blocker and talking to him. (Blocker Dep. p. 8). While they were talking, Officer Fincher, one of the defendants, came up to Easterling and said, "What did you say, Boy?" He replied, "I didn't say nothing." (*Id.*) At that moment, Fincher pulled out a "gun" and shot Easterling. Although it was only a cap pistol, the episode frightened the deceased, and those around him. Fincher, who was in uniform and driving his patrol car, laughed and went into a nearby store after firing the "weapon." (*Id.* at 8–12).

On May 2, 1985, approximately two days before the prom, Officer Fincher stopped Lindy Boy Easterling and issued him a traffic citation for "laying drag." (Fincher Dep. pp. 5–6). Further, plaintiffs assert that in the National Guard Armory parking lot on the night of the prom, Officer Fincher threatened the deceased. A bystander overheard Fincher tell Easterling: "I'll get you before the night is over." (Kwok Dep. pp. 5–8).

Plaintiffs do not dispute the path of the chase as described in defendants' evidence. They do add, however, several relevant occurrences. For example, as the police cars pursued the Easterling vehicle on the Sand Hill Road, the sounds of the chase diverted two people from their television wrestling program at approximately 1:00 a.m. (*See* Sidney Hall Dep. p. 6). These two men promptly followed in their automobile to see what was happening. (*Id.* at 6–7). According to Sidney Hall, who recognized the Easterling vehicle, the chase stopped at the Sand Hill Road's intersection with Highway 196 by the Time Saver Food Store. The driver of the Easterling vehicle opened the door as if he were about to exit. At the same time, the police officer in the lead vehicle exited his patrol car with an object in his hand and moved toward the Easterling car. (*Id.* at 7–9). Immediately, the driver closed his car door, turned right on Highway 196, and traveled back toward Glennville. (*Id.*).

Additionally, plaintiffs emphasize the deposition testimony of Eileen Stubbs. While she was waiting to cross over Highway 301 and proceed east on Hencart Road in the direction of her home, she saw a beige automobile (presumably the one driven by the decedent) signal and turn on to Hencart Road from Highway 301 at a normal rate of speed. (Stubbs Dep. pp. 4–6, 9, 21–22). After she had crossed Highway 301 and travelled a short distance on Hencart Road, a police car with its blue lights flashing came around her at a high rate of

2. The point where the decedent lost control of his car was about one-half mile from his home.

speed, pursuing the beige vehicle. (*Id.* at 12). When she stopped at the first stop sign (intersection of Hencart Road and Caswell Street), another police car, traveling north on Caswell, turned right on to Hencart Road in front of her and proceeded in the direction taken by the other police car. Because she drove slowly, she was left behind by the speeding vehicles. (*Id.* at 14). After a few moments, she came upon the accident scene. She saw three police cars—two facing in the direction from which she came, and one facing in the opposite direction. (*Id.* at 26–27).

Plaintiffs assert that although the officers testified that they did not know who they were chasing, other evidence disputes this. For example, plaintiffs offer the deposition testimony of Ricky Cummey, who testified that while listening to his police scanner, he heard Officer Fincher exclaim, "It's the Easterling's car!" when the chase stopped or slowed at the Time Saver Food Store. Further, plaintiffs point to Chief Sand's deposition, wherein he testified that he heard Officer Fincher say that the person they were pursuing "... could be the Easterling subject." (Sands Dep. p. 28).[3]

Plaintiffs also offer deposition testimony in support of their contention that the City of Glennville, its Chief of Police, and its officers had a policy or custom of engaging in high-speed pursuits of traffic law violators. For example, Officer Langley testified that he had been involved in two chases besides that of plaintiffs' decedent. His first was the pursuit of a motorcyclist who had been driving on the wrong side of the road. He gave chase; the biker subsequently lost control of his cycle on a dirt road, but was not injured. (Langley Dep. p. 7). In the second episode, the vehicle he was chasing hit a telephone pole and overturned. Again, he testified that the driver was not injured. (*Id.* at 8). He received no oral or written reprimands from Chief Sands regarding these incidents. (*Id.* at 10).

Officer Gray testified about two high-speed pursuits he was involved in prior to the Easterling incident. In the first, he attempted to overtake a speeding Camero, but the vehicle was too fast. The Officer had to break off the chase and radio ahead for the Georgia State Patrol to apprehend him. (Gray Dep. pp. 5–6). The other episode involved a car that passed through Glennville at a high rate of speed (between sixty and eighty m.p.h.), heading west on Georgia Highway 144. Officer Gray spotted him, and gave chase. It was not much of a chase, because the officer's car would not do over sixty miles per hour. He did

3. Plaintiffs also attempt to show that Officer Gray and Chris Sands, the Chief's son, were waiting for Lindy Boy Easterling in their patrol car between the accident site and his home. They argue that after Officer Gray failed in the roadblock attempt on Highway 196, that instead of going west on that road back toward Glennville, he and young Sands proceeded east on Highway 196, turned left onto Brick Yard Branch Road, crossed over that road's intersection with Highway 144, and turned on to Hencart Road. Knowing it was Lindy Boy Easterling who was being chased, they waited for him. When he came around the curve (or over a hill), they directed the spot light of the police car in his face, blinding him, and causing him to lose control of his car.

The Court cannot consider the deposition testimony offered in support of this contention. Plaintiffs attempt to show this occurrence through the testimony of John Howard, a student at Glennville High School and a schoolmate of Chris Sands. Howard testified that he walked up when Chris Sands was talking at school, and heard him tell a group of people that when Easterling came around the top of the hill, he and Officer Gray were there "shining a light." (Howard Dep. pp. 5–7).

This statement is hearsay and inadmissible. "Rule 56(c) expressly provides that the court may make use of depositions on a summary judgment motion. Only that portion of deposition that would be admissible in evidence at trial may be introduced on a summary judgment motion, however." *See* Wright, Miller & Kane, *Federal Practice & Procedure Civil 2d* § 2722 (1986). *See* Fed.R.Evid. 802.

Plaintiffs attempt to buttress this hearsay statement with Eileen Stubbs' testimony that one police car at the accident scene was facing in an opposite direction from that of the chase. Putting aside for a moment Officer Gray and Chris Sands' testimony that they were not at the accident scene when Easterling's car left the road (Gray Dep. p. 14; Chris Sands Dep. pp. 11–12), Ms. Stubbs was apparently driving slow enough that the car parked opposite of the course of the chase (presumably driven by Gray) could have had enough time to reach the scene *after* the crash.

radio ahead, however, and units of the Tattnall County Sheriff's Department and Georgia State Patrol finally captured the suspect when he lost control of his car in Reidsville, Georgia, and hit a brick wall in front of the Tattnall County Courthouse. (*Id.* at 7–8). Officer Gray stated that after these incidents he was not reprimanded in any way by the Chief, Mayor, or City Council. (*Id.* at 8).

Officer Allen testified that he had chased a white Firebird down Highway 301 towards Long County, and that he radioed ahead for assistance. (Allen Dep. p. 12). The State Patrol set up a roadblock north of Ludowici, Georgia. The Firebird went through the roadblock, rolled over, and went into the woods. (Gray Dep. p. 10). Additionally, Officer Phillips stated that he had also been involved in a high speed pursuit of a vehicle. He testified that he chased an automobile from a point east of Glennville on Highway 144 until some point in Long County, at which time a tire on the car he was pursuing "blew out," causing the car to stop. (Phillips Dep. pp. 16–18). He also was not reprimanded for his conduct by the Chief. (*Id.* at 19).

All but one of the defendant officers testified that they were given no instruction or training, written or oral, as to the proper procedure to follow in high-speed chases. (Phillips Dep. p. 14; Fincher Dep. pp. 19–20; Gray Dep. pp. 10–11). Officer Langley stated he had received some "oral" instruction. (Langley Dep. p. 6). Furthermore, Chief Sands stated, and most of the officers concurred, that the decision of whether or not to pursue a vehicle was left to the individual officer's discretion. (Sands Dep. p. 14; Phillips Dep. p. 14; Gray Dep. p. 11; Langley Dep. p. 6). Chief Sands testified that there was no written policy on pursuit of vehicles. (Sands Dep. p. 16). However, he indicated that the officers did not have unbridled discretion. As a result of meetings and discussions held with the officers, several elements would figure into the chase equation. For example, other vehiclar traffic, pedestrian traffic, road and weather conditions, and the chances of catching the suspect were all to be considered. (*Id.* at 43). Safety was the top priority. (*Id.* at 44).

Chief Sands also testified that he closely followed the chase of Lindy Boy Easterling as it progressed, and stated that it was handled in a manner consistent with the policy of the City of Glennville. (*Id.* at 15, 18–24). Moreover, he indicated that he did not reprimand anyone for their conduct that night. (*Id.* at 24). Chief Sands was aware of several incidents prior to that with Lindy Boy Easterling where officers of the force had engaged in high-speed chases of vehicles. (*Id.* at 33–34, 36–37). On two occasions, where the identity of the suspect was known, the officers had broken off the pursuit and arrested the suspect later at his home. (*Id.* at 36–38). He stated that he was the person primarily responsible for determining City policy for the Police Department. (*Id.* at 6, 19). Finally, the Chief, realizing that high-speed chases are dangerous to all concerned (the suspect, the officer, and the public), indicated that it was inevitable that someone was going to be injured as a result of a chase. (*Id.* at 19–21).[4]

## II. *Analytical Framework*

Before turning to the arguments made by the defendants in their motion for summary judgment, some preliminary matters merit discussion. First, it is necessary to determine the specific constitutional right plaintiffs' claim to have been abridged by defendants' alleged actions. Plaintiffs' five count complaint,[5] containing no pen-

4. Chief Sands also related that on the night of May 5, 1985, Officer Fincer was patroling with only a temporary certification. (Sands Dep. p. 8).

5. An introductory paragraph of the complaint states that the "defendant police officers ... engaged in a *negligent* pursuit of plaintiffs' seventeen year old son, Lindy Boy Easterling." Complaint ¶ 9 (emphasis added). Count One alleges that defendants "violated plaintiffs' rights ... because they engaged in a policy, pattern and practice of pursuing persons with police vehicles [sic] without concern for safety of the person pursued or the safety of the general public." *Id.* at ¶ 13. Count Two alleges that the City of Glennville "has engaged in a policy, pattern and practice of failing to properly train,

dent state tort claims, alleges that defendants violated their son's rights under § 1983, but it fails to state which specific constitutional guarantee was denied.[6]

In the Joint Status Report, plaintiffs basically repeat the allegations of their complaint, and add for the first time the specific constitutional guarantee allegedly denied their son:

> Plaintiffs allege that the Defendants denied Lindy Boy Easterling *due process under the law* as guaranteed by the 4th and 14th Amendment to the United States Constitution and the Georgia Constitution by depriving him of his life without benefit of trial.

Joint Status Report, p. 3 (emphasis added).[7]

It is not enough for plaintiffs to state that they have a § 1983 claim arising out of an alleged violation of the due process clause of the Fourteenth Amendment,[8] for that allegation is too broad in light of the complexities inherent in that clause, the Supreme Court's decision in *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), and this Circuit's decision in *Gilmere v. City of Atlanta,* 737 F.2d 894 (11th Cir.1984), *rev'd,* 774 F.2d 1495 (11th Cir.1985) (*en banc*), *cert. denied,* 476 U.S. 1124, 106 S.Ct. 1993, 90 L.Ed.2d 673 (1986).

One must recognize that the Due Process Clause is the source of *three* distinct constitutional protections:

> *First,* it incorporates specific protections defined in the Bill of Rights. Thus, the State, as well as the Federal Government, must comply with the commands in the First and Eighth Amendments; so too, the State must respect the guarantees in the Fourth, Fifth, and Sixth Amendments. *Second,* it contains a substantive component, sometimes referred to as "substantive due process," which bars certain arbitrary government actions "regardless of the fairness of the procedures used to implement them." ... *Third,* it is a guarantee of fair procedure, sometimes referred to as "procedural due process:" the State may not

instruct and supervise the activities of its police officers." *Id.* at ¶ 16. Count Three alleges that "the City of Glennville, Georgia, acting by and through its chief of police, has engaged in a policy, pattern and practice of failing to properly train, instruct and supervise its police officers." *Id.* at ¶ 19. Count Four alleges that "the City of Glennville, Georgia, through its police officers, has engaged in a policy, pattern and practice of harassing and intimidating the public, particularly in matters pertaining to alleged traffic violations.." *Id.* at ¶ 22. Finally, in Count Five, plaintiffs allege that the defendants "have a policy of authorizing its police force to use excessive force in the apprehension of persons suspected of violating minor traffic laws." *Id.* at ¶ 25.

6. The requirement that plaintiffs allege what specific constitutional rights have been abridged finds its origin in the statute and case law. Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities *secured by the Constitution* and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.... (emphasis added).

Further, the Supreme Court has stated: "By its terms, of course, the statute creates *no substantive rights;* it merely provides remedies for deprivations of rights established elsewhere." *Oklahoma City v. Tuttle,* 471 U.S. 808, 816, 105 S.Ct. 2427, 2432, 85 L.Ed.2d 791, 800 (1985) (citing *Baker v. McCollan,* 443 U.S. 137, 99 S.Ct. 2689, 91 L.Ed.2d 433 (1979)) (emphasis added). Thus, the mere assertion that defendants violated decedent's rights under § 1983 is insufficient.

7. The Court assumes that plaintiffs meant to write "due process of law as guaranteed by the *5th* and 14th Amendment" rather than what appears above. This assumption is based upon the fact that the Fourth Amendment does *not* contain a due process clause. Although the two Due Process Clauses of the Constitution are virtually identical, the Due Process Clause of the Fifth Amendment applies *only* to actions of the federal government, whereas the Due Process Clause of the Fourteenth Amendment is a limitation upon the power of the states. *See* 16A *Am Jur 2d,* Constitutional Law, § 804 (1979). Because this action is against state actors, the Court, when discussing the Due Process Clause, is referring to the one found in the Fourteenth Amendment, as the one found in the Fifth Amendment is not applicable.

8. The due process clause of the Fourteenth Amendment provides: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law...."

execute, imprison, or fine a defendant without giving him a fair trial, nor may it take property without providing appropriate procedural safeguards.

*The type of Fourteenth Amendment interest that is implicated has important effects on the nature of the constitutional claim and the availability of § 1983 relief.*

*Daniels v. Williams,* 474 U.S. 327, 337, 106 S.Ct. 662, 677–78, 88 L.Ed.2d 662, 672 (1986) (Stevens, J., concurring) (emphasis added) (footnotes omitted).

Plaintiffs make no allegation of a violation of a specific protection defined in the Bill of Rights; thus, the Court turns its attention to the other two protections offered by the Due Process Clause of the Fourteenth Amendment—procedural and substantive due process.

■ If plaintiffs' broad due process allegation is one of *procedural* due process, *Parratt* and *Gilmere,* cited *supra,* dictate that such a claim is *not* cognizable in federal court if adequate post-deprivation state tort remedies exist. In *Parratt,* the Supreme Court held that a random and unauthorized negligent deprivation of property by a state employee does not amount to a due process violation cognizable under § 1983 if the state provides a meaningful post-deprivation remedy. 451 U.S. at 543–44, 101 S.Ct. at 1916–17, 68 L.Ed.2d at 433–34. Mindful of converting the Fourteenth Amendment into a "font of tort law to be superimposed upon whatever systems may already be administered by the states," 451 U.S. at 544, 101 S.Ct. at 1917, 68 L.Ed.2d at 434 (quoting *Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976)), the Court relegated a prisoner's efforts to seek compensation for the loss of his $23.50 hobby kit to a tort suit in state court. Later, the Court extended *Parratt's* rationale to an intentional deprivation by a state employee where it was impractical to hold a pre-deprivation hearing, and where an adequate post-deprivation state remedy existed. *See Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984);[9] *see generally Fundiller v. City of Cooper City,* 777 F.2d 1436, 1439 (11th Cir.1985).

The crucial decision on this issue in this Circuit is *Gilmere v. City of Atlanta,* 774 F.2d 1495 (11th Cir.1985) (*en banc*). In *Gilmere,* police officers killed Thomas Patillo during his arrest. His sister, as administratrix of his estate, brought suit against the police officers, their supervisors, and the City of Atlanta under § 1983. A panel of the Eleventh Circuit, in regard to plaintiff's claim against the officers, held that under *Parratt,* the state tort remedies were all the process that was due because the conduct was random and unauthorized, and a pre-deprivation hearing was impractical. *Gilmere,* 737 F.2d 894, 908 (11th Cir.1984). Upon rehearing, the *en banc* court stated the following as the issue presented:

> We accepted this case for an *en banc* consideration primarily to determine whether *Parratt v. Taylor* precludes a claim by his administratrix under 42 U.S.C. § 1983 because state tort law provides a comparable remedy.

*Gilmere,* 774 F.2d at 1496.

After discussing at length the legislative history of § 1983 and the relevant case law, the Court found *Parratt* necessarily limited by both. *Id.* at 1499. For example, the court noted that the continuing statutory grant of federal jurisdiction over § 1983 suits "indicates that Congress, at least, continues to adhere to the belief that police abuse is a sufficient threat to constitutional rights to warrant 'a federal right in federal courts.'" *Id.* Further, the

9. The deprivations in both *Hudson* and *Parratt* were occasioned by "random and unauthorized" acts of state employees, and were outside of the State's control. *Hudson,* 468 U.S. at 532–33, 104 S.Ct. at 3203, 82 L.Ed.2d at 406–07. In contrast, the Supreme Court distinguished *Parratt* and allowed a plaintiff to proceed where his deprivation was occasioned by an "established state procedure" in *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982). There the Court faced a claim by petitioner that a *statute,* not a random act of an employee, deprived him of a property right by operation of law. In the case at bar, the deprivation, if any, resulted from "random and unauthorized" acts, not "established state procedures," requiring application of *Parratt,* not *Logan.*

court, after examining *Parratt,* held that the Supreme Court

> indicated that its analysis was not based upon the conclusion that all section 1983 claims were to be turned into state torts whenever possible, but rather that the particular constitutional violation at issue —the deprivation of *procedural due process*—simply did not occur until the plaintiff was actually denied *any* procedure for redress in the state system ... such reasoning implicity *distinguishes* procedural due process claims from *other* constitutional violations that are complete regardless of the subsequent adjudicative procedures being used.

*Id.* (emphasis added.)

Under the facts of *Gilmere,* the court articulated two theories which would allow injured parties to bring § 1983 actions against police officers *regardless* of whether adequate state remedies are available. First, an individual could maintain a § 1983 action against a police officer whenever the defendant's conduct violated substantive due process. Similarly, an individual could bring a § 1983 action against a police officer when the defendant's conduct violated rights protected by one of the specific constitutional guarantees of the Bill of Rights.[10] In *Gilmere,* the court held that a Fourth Amendment violation was made out due to the "unreasonable seizure" of the decedent by the police officers. *Gilmere,* 774 F.2d at 1501–02. Although the *Gilmere* Court's analysis of the procedural due process claims pertained only to the liability of *individual police officers,* the Eleventh Circuit in *Depew v. City of St. Mary's, Georgia,* 787 F.2d 1496 (11th Cir. 1986), rather summarily applied *Gilmere* to municipal liability as well.

After applying *Gilmere* to the instant case, it is obvious that a claim of deprivation of *procedural* due process cannot proceed as adequate post-deprivation state tort remedies exist for plaintiffs against the officers, the Chief of Police, and the City. For example, plaintiffs could bring an action against the officers individually in the state courts. *See Acker v. City of Elberton,* 176 Ga.App. 580, 581, 336 S.E.2d 842 (1985) (policeman who commits a tortious act violates a duty he owes to one who is injured even though his municipal employer may be exempt from liability). Plaintiffs could also sue Chief Sands in his supervisory capacity. *See Massey v. Perkerson,* 129 Ga.App. 895, 201 S.E.2d 830 (1973) (Chief liable for tort of subordinate if present, ordered, or supervised the conduct). Finally, plaintiffs could bring an action against the City. Although the City would not be liable on a theory of *respondeat superior, see* O.C.G.A. § 36–33–3 (municipal corporation not liable for torts of its policemen), it could be held responsible for its *own* negligence in training, hiring, *etc. See Toombs County, Georgia v. O'Neal,* 254 Ga. 390, 330 S.E.2d 95 (1985) (defense of sovereign immunity waived to extent of the municipality's liability insurance coverage); *see also Depew,* 787 F.2d at 1497 n. 2. In any event, plaintiffs have not carried their burden of showing that the remedies available in state court are inadequate. *See Owens v. City of Atlanta,* 780 F.2d 1564, 1567 (11th Cir.1986); *see also Daniels v. Williams,* 474 U.S. 327, 339, 106 S.Ct. 662, 679, 88 L.Ed.2d 662, 673 (1986) (Stevens, J., concurring) ("[A] complaint does not state a valid procedural due process objection—and a valid § 1983 claim—if it does not include a challenge to the fundamental fairness of the State's procedures.").

Therefore, if this action is to survive, the Court must presume that plaintiffs' broad due process allegation is a specific claim of denial of *substantive due process.* The *Gilmere* Court defined it as follows:

> [S]ubstantive due process claims allege that certain governmental conduct would remain unjustified even if it were accompanied by the most stringent of procedural safeguards ... [I]t is violated when the government engages in actions

10. The excerpt from Justice Stevens' concurrence, quoted *supra* at p. 917, followed quite closely the analysis made by the *Gilmere* court.

> which "'offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses.'" [*Rochin v. California,*] 342 U.S. [165,] 169, 72 S.Ct. [205,] 208 [96 L.Ed. 183 (1952)] ... The [Supreme] Court conceded at that time that "[t]hese standards of justice are not authoritatively formulated anywhere as though they were specifics," *id.*, and concluded only that substantive due process is violated by state conduct that "shocks the conscience" or constitutes force that is "brutal" and such as "to offend even hardened sensibilities." *Id.* at 172–73, 72 S.Ct. at 209.

*Gilmere,* 774 F.2d at 1500. The Court noted that conduct by state actors which gives rise to a substantive due process claim is necessarily more egregious than that which gives rise to a simple tort action. *Id.*

To determine whether there has been a substantive due process violation in the context of § 1983 action, this circuit has developed a two-part test:

> 1. Was there a deprivation of an interest protected by the federal constitution?
>
> 2. Was the deprivation, if any, the result of an abuse of governmental power sufficient to raise an ordinary tort to the stature of a constitutional violation?

*Rymer v. Douglas County,* 764 F.2d 796, 801 (11th Cir.1985).

The inquiry under the first prong of the test is easily answered. The deceased's interest in his life was plainly of constitutional dimension. *Cf. Tennessee v. Garner,* 471 U.S. 1, 9, 105 S.Ct. 1694, 1700, 85 L.Ed.2d 1, 8 (1985) ("The suspect's fundamental interest in his own life need not be elaborated upon."); *see also Williams v. Kelley,* 624 F.2d 695, 697 (5th Cir.1980), *cert. denied,* 451 U.S. 1019, 101 S.Ct. 3009, 69 L.Ed.2d 391 (1981).

The inquiry prompted by the second prong of the test is not so easily made because "[d]ue process of law, as a historic and generative principle, precludes defining." *Rochin v. California,* 342 U.S. 165, 173, 72 S.Ct. 205, 210, 96 L.Ed. 183 (1952). There are no precise standards for determining what actions are proscribed by substantive due process.

The "shock the conscience" test of *Rochin,* discussed *supra* in the quotation from *Gilmere,* was the first standard enunciated by the Supreme Court. There the Court held inadmissible incriminating evidence which had been obtained by police who subjected a suspect to a stomach pump. Since *Rochin,* the lower courts have developed somewhat more concrete standards for identifying when substantive due process is violated by the police. *See Gilmere,* 774 F.2d at 1500.

The most widely quoted statement is found in *Johnson v. Glick,* 481 F.2d 1028 (2d Cir.) (Friendly, J.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973), a case in which a corrections officer struck and threatened to kill a pretrial detainee. The court listed several factors which help distinguish police conduct which reaches constitutional dimensions from that which merely constitutes a tort. When dealing with acts of law enforcement personnel, Judge Friendly wrote that

> a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.

*Id.* at 1033.

In a decision that is binding precedent upon this Court, the Fifth Circuit adopted the *Johnson* factors in *Williams v. Kelley,* 624 F.2d at 697, a case where jailers applied a fatal choke hold upon plaintiff's decedent. Additionally, the Fifth Circuit, in another binding precedent, adapted the *Johnson* factors in *Shillingford v. Holmes,* 634 F.2d 263 (5th Cir.1981). In this case, the plaintiff suffered a lacerated forehead when a policeman struck him with a nightstick. The Court stated:

> In determining whether the state officer has crossed the constitutional line

that would make the *physical abuse* actionable under Section 1983, we must inquire into the amount of force used in relationship to the need presented, the extent of the injury inflicted and the motives of the state officer. If the state officer's action caused severe injuries, was grossly disproportionate to the need for action under the circumstances and was *inspired by malice rather than merely careless or unwise excess of zeal so that it amounted to an abuse of official power that shocks the conscience,* it should be redressed under Section 1983.

The degree of force exerted and the extent of physical injury inflicted that together amount to a constitutional deprivation must, of course, be determined by the facts of a given case ... Actions permissible in controlling a riotous mob might weigh differently when taken against a peaceful pedestrian.

*Id.* at 265 (emphasis added).[11]

One must focus, therefore, on the officers' conduct in assessing their potential liability. The cases are clear that "negligent conduct of state officials *can not* give rise to a valid Fourteenth Amendment claim." *Dunster v. Metropolitan Dade County,* 791 F.2d 1516, 1518 (11th Cir.1986) (citing *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 677 (1986)); *see also Owens v. City of Atlanta,* 780 F.2d 1564, 1566 (11th Cir.1986) (mere negligence of a police officer not sufficient to state § 1983 claim for denial of substantive due process).

Although the Supreme Court recently side-stepped the issue in *Daniels v. Williams,* 474 U.S. at 334 n. 3, 106 S.Ct. at 667 n. 3, 88 L.Ed.2d at 670 n. 3 ("[T]his case affords us no occasion to consider whether something less than intentional conduct, such as recklessness or 'gross negligence' is enough to trigger the protection of the Due Process Clause."), at least one Court of Appeals held in a case decided prior to *Daniels* that *intentional* conduct by an officer is required to violate one's substantive due process rights. *See Wilson v. Beebe,* 770 F.2d 578, 586 (6th Cir. 1985) (en banc).

The *Wilson* Court based that conclusion upon its finding that the factors identified in *Johnson v. Glick* and *Rochin v. California, supra,* all relate to "purposeful infliction of injury." *Wilson,* 770 F.2d at 586. Although the issue of whether it takes intentional or merely reckless police conduct to violate substantive due process has not been squarely addressed in this Circuit, the *Owens* court did cite favorably to *Wilson* in reaching its conclusion that negligent conduct by state officers does not violate substantive due process. Therefore, this Court concludes, following *Wilson,* that intentional conduct by a police officer is probably necessary to hold *him* liable for a violation of substantive due process.[12]

Some difficulty has been faced by the Court in the instant case because plaintiffs' complaint against the defendant officers complains of their *negligence. See supra* Note 5. Additionally, their portion of the

11. The balancing test is analogous to that used in Fourth Amendment cases as it is concerned with similar competing interests. *See Jamieson v. Shaw,* 772 F.2d 1205, 1210 n. 7 (5th Cir.1985). Although plaintiffs allege in Count Five of their complaint that the Glennville Police used excessive force in the apprehension of traffic violators, they did not make a claim of abridgement of Fourth Amendment rights. Even if they did make that allegation, it is doubtful that the requisite "seizure" necessary to make out a Fourth Amendment claim exists. *See Gilmere,* 774 F.2d at 1501–02 (to invoke Fourth Amendment, there must be a seizure, and it must be unreasonable). The police in the instant case never arrested Lindy Boy Easterling. Additionally, the Court notes that although it can discover no case where this standard defining a violation of substantive due process has been applied to a situation similar to that of the instant case, *i.e.,* where there has actually been no direct use of physical force, the standard as adapted by the *Shillingford* court appears broad enough to fit the case at bar.

12. Note that this holding concerning the potential liability of the officers does not affect the potential liability of the city, which is judged under a different standard. *See infra* Part IIIC of this order.

Joint Status Report, with one exception,[13] complains again of the *negligence* of the defendant officers:

> Plaintiffs ... allege that through a policy, pattern and practice of entering into high-speed automobile pursuits of persons suspected of having committed minor traffic offenses and of failing to properly train, instruct and supervise its police officers, the City of Glennville and the other named Defendants conducted a high-speed pursuit chase in an improper and *negligent* manner resulting in the wrongful death of Lindy Boy Easterling ...
>
> ... Plaintiffs contend that ... police officers of the City of Glennville, acting under color of state law, engaged in a *wreckless* [sic] *and negligent* high-speed pursuit of the Plaintiff's seventeen-year old son, Lindy Boy Easterling....

Joint Status Report, pp. 2–3 (emphasis added).

Although the pleadings and Joint Status Report are framed in terms of negligence and recklessness, "the pleadings are not controlling on a motion for summary judgment; the Court must consider the issues presented by the other material offered by the parties on the motion to determine whether the Rule 56 request should be granted." *See* Wright, Miller & Kane, *Federal Practice & Procedure Civil 2d.* § 2721 (1986).

From examining the evidence submitted, the Court concludes that the defendant officers may have been negligent and/or reckless in failing to break-off the chase and arrest Easterling at a later time when it would have been safer for all concerned. But, on another level, the Court finds that sufficient evidence exists to allow a jury to judge the motivation of Officer Fincher and the others that night. Were they out to "get" the Easterling youth? Was the chase a culmination of previous police misconduct or a legitimate exercise of police power? Certainly, the events preceeding the accident (the "shooting" with the toy gun, the threats), present factual questions on these issues. Officer Fincher's *intentional* harassment of Easterling may have led directly to his flight from the police and his subsequent death. While negligent conduct does not violate due process, "the clause does protect against arbitrariness and abuse of power...." *Partridge v. City of Houston,* 791 F.2d 1182, 1187 (5th Cir.1986). It should be left to the jury to decide if the officers' conduct amounted to an abuse of their police powers.

The Court has engaged in this lengthy discourse about substantive due process in an attempt to educate the parties about the law which will be applied during the trial of this case. As neither side raised any of these important issues in their briefs, the Court must assume that they were unaware of these relevant precedents. Hopefully, counsel can now familiarize themselves with the case law.

## III. *Defendants' Motion*

Now that the legal basis of plaintiffs' claim has been clarified, the Court can turn to the merits of defendants' three-part summary judgment motion. The first contention applies to all defendants, the second to the individual officers, and the third to the municipality. The Court will consider them seriatim.

### A. Contributory Negligence/Assumption of Risk.

All defendants assert that plaintiffs cannot recover as a matter of law because their son failed to exercise ordinary care for his own safety, and his conduct constituted an assumption of risk. They point out that at the time of the accident, there were no police cars in his vicinity, and that the officers never attempted to block the road, shoot out the Easterling vehicle's tires, or take any other forceful measures to stop him. Therefore, they argue, noth-

13. As can be seen from the second paragraph of the excerpt quoted *infra,* plaintiffs make a passing reference to reckless conduct on behalf of the defendant officers. Recklessness is equated by the common law with gross negligence. *See* Prosser and Keaton on *The Law of Torts* 214 (5th ed. 1984).

ing prevented decedent from negotiating the fatal curve at a safe speed.

Plaintiffs respond that their son was not assuming a risk, but avoiding one, *i.e.*, mistreatment by Officer Fincher. Moreover, they contend that the evidence must be clear and uncontroverted to take the issue from the jury, *see Gardner v. Balliet*, 121 Ga.App. 487, 174 S.E.2d 360 (1970), and that it can not be said that the facts here are so conclusive in defendants' favor to merit entry of summary judgment.

Viewing the evidence in light most favorable to plaintiffs, the jury could infer that several police cars pursued Lindy Boy Easterling for speeding, and that he did not stop as was his legal obligation [14] until several miles had elapsed in the chase. When he did stop near the Time Saver Food Store, a jury could infer that the police learned his identity, and that Officer Fincher, who had frightened the decedent on one occasion and threatened him on another, exited his car and moved toward him with something in his hand, at which time Easterling fled.

As the facts here are in great conflict, and the evidence, viewed in a light favorable to plaintiffs, lends some credence to their theory of the case, the Court declines to hold as a matter of law that plaintiffs' decedent failed to exercise ordinary care for his own safety and assumed the risk that resulted in his death. The Court will probably charge the jury on these principles at defendants' request, for the argument that Easterling lost control of his car due to his own negligence is a compelling one; however, it is an issue the Court prefers to leave with the factfinder.

B. Qualified Immunity.

■ The defendant police officers next assert the defense of qualified immunity. They argue that their conduct could only be characterized as the good faith performance of their duties, and that they acted with no impermissible motives. Plaintiffs respond that there are genuine issues of fact with regard to defendants' entitlement to good faith immunity. They argue that the officers should have known that their high speed persuit would have violated Lindy Boy Easterling's right to life. Additionally, plaintiffs point to Officer Fincher's harassment and threats against the deceased as further evidence of lack of good faith on defendants' behalf. Implicit in their argument is the contention that the officers, knowing who their suspect was, should have broken off the chase and arrested their son later, avoiding the need for a high-speed pursuit.

■ The defense of qualified immunity is available to law enforcement personnel only, not their municipal employer, and the latter may not assert the former's good faith as a defense. *Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980).[15] As stated in *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982):

> Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

This is an objective test, and what is or is not a clearly established statutory or constitutional right is a question for the Court. *Watkins v. Roche*, 560 F.Supp. 416, 420 (S.D.Ga.1983), *aff'd*, 751 F.2d 1260 (11th Cir.1985).

There is little doubt that one's life is clearly protected by the constitution. Application of the test, however, is a task for the jury unless there is no genuine issue of material fact. When viewing the evidence in a light most favorable to plaintiffs, it is possible that a reasonable person would have known that a possibly unnecessary high speed pursuit caused by a suspect's

14. O.C.G.A. § 40-6-2 provides: "No person shall willfully fail or refuse to comply with any lawful order or direction of any police officer ... invested by law with authority to direct, control or regulate traffic."

15. Punitive damages are available against the defendant officers, but not against the City. *See Newport v. Facts Concerts*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981).

fear of his captors could have resulted in death. Considering Officer Fincher's harassment of the deceased and the events at the stop of the vehicle at the Time Saver Food Store, the issue of the officers' good faith is not amenable to summary judgment. Of course, the Court will probably charge the jury on good faith immunity at the defendants' request.

C. Municipal Liability.

In *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court interpreted § 1983 to make municipalities liable for deprivations of rights secured by the Constitution whenever the municipality itself subjects a person or causes a person to be subjected to that deprivation. The liability of a city is not, however, based upon *respondent superior.* Instead, "[t]he municipality must be at fault in some sense for establishing or maintaining the policy which causes the injurious result, although the policy in question may be an informal custom which has not received formal approval but has attained the 'force of law.'" *See Owens,* 780 F.2d at 1567 (citing *Fundiller v. City of Cooper City,* 777 F.2d 1436, 1442 (11th Cir.1985)). Whether the basis of the claim is an official policy or an unofficial custom, it must be the "moving force" behind the constitutional deprivation before liability may attach. *Oklahoma City v. Tuttle,* 471 U.S. 808, 820, 105 S.Ct. 2427, 2434, 85 L.Ed.2d 791, 802 (1985).

"The Supreme Court has defined the term 'custom' to include 'persistent and wide-spread ... practices,' 'permanent and well-settled' practices, and 'deeply embedded traditional ways of carrying out policy.'" *Fundiller,* 777 F.2d at 1442 (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167–68, 90 S.Ct. 1598, 1613–14, 26 L.Ed.2d 142 (1970)). "To establish a policy or custom, it is generally necessary to show a persistent and wide-spread practice," *Depew,* 787 F.2d at 1499, as "[a] municipality can generally not be liable for a single act of negligence or misconduct." *Anderson v. City of Atlanta,* 778 F.2d 678, 685 (11th Cir.1985). Moreover, a policy or custom can be attributed to the municipality if it is created or ratified by an official of such rank (such as a police chief) that he or she could be said to be acting on behalf of the municipality. *Hearn v. City of Gainesville,* 688 F.2d 1328, 1334 (11th Cir.1983).

Under these standards, plaintiffs must show the existence of a municipal policy, custom, pattern or practice which was a "moving force" behind the police officers' actions, *and* fault on the City's part in adopting or retaining an unconstitutional policy. *See Owens,* 780 F.2d at 1567–68.

Plaintiffs allege that the City has a policy of allowing its police officers to pursue traffic law violators at high speeds without concern for the safety of the person pursued or the general public, and that it has a policy of allowing the use of excessive force in the apprehension of persons suspected of violating minor traffic laws. *See* Complaint, Counts One and Five. The City argues that the evidence is insufficient to establish any of the customs, policies, patterns or practices alleged by plaintiffs and that judgment should be entered in its favor. Plaintiffs respond by pointing to the evidence with respect to other high-speed pursuits that ended with a crash or wreck of the pursued vehicle, and argues that knowledge of the incidents was widespread, and that it was the custom of the City, acting through its chief of police and police officers, to chase a violator of traffic laws until he was apprehended. Furthermore, they cite Chief Sand's approval of the way the chase was carried out, and his failure to reprimand the officers involved in the Easterling chase and previous pursuits.

In viewing the evidence in a light most favorable to the plaintiffs, the jury could infer that the City of Glennville has a policy of engaging in high-speed pursuits of violators of minor traffic laws, and that such practices may be carried out using excessive force, resulting in accidents and injuries. Further, the evidence shows knowledge of the policy and ratification of it by the City's policymaker, the Chief of Police. Plaintiffs have *not* shown the poli-

cy itself, or as applied to the decedent, was unconstitutional; however, that is not their burden at this stage of the proceedings. On a motion for summary judgment, the movant bears the burden of establishing the absence of a genuine issue of fact. Here, the city's motion did not purport to show the constitutionality of its policy, or its lack of fault. Instead, defendants' motion argued that insufficient evidence of a policy even existed. Plaintiffs' evidence shows that such a policy did exist. Therefore, defendants' motion on this point must be denied.

Plaintiffs also allege that the City has a policy of failing to train its police officers. *See* Complaint, Counts Two and Three. Both parties rely on the following:

> We conclude that if there is a cause of action under section 1983 for failure to properly train a police officer whose negligent or grossly negligent performance of duty has injured a citizen, that such failure to train must constitute gross negligence amounting to conscious indifference, and that a municipality is not liable under section 1983 for the negligence or gross negligence of its subordinate officials, including its chief of police, in failing to train the particular officer in question, in the absence of evidence at least of a pattern of similar incidents in which citizens were injured or endangered by intentional or negligent police misconduct and/or that serious incompetence or misbehavior was general or widespread throughout the police force.

*Languirand v. Hayden,* 717 F.2d 220, 227–28 (5th Cir.1983), *cert. denied, sub. nom., Languirand v. Pass Christian,* 467 U.S. 1215, 104 S.Ct. 2656, 81 L.Ed.2d 363 (1984).

Defendants' motion asserts that its officers were adequately trained, and that no pattern of incidents similar to that between plaintiffs' decedent and the police occurred prior to the death of Lindy Boy Easterling. Plaintiffs' evidence refutes that contention. There were accidents in prior high-speed pursuits, an absence of regulations governing them, and a lack of training about when to chase and how to do it safely. Therefore, an issue of fact remains, precluding summary judgment.

Although the Court denies defendants' motion for summary judgment on plaintiffs' "failure to train" allegation, the parties should note that the law is in flux in this area. Justice Rehnquist in *Tuttle* raised serious questions about the viability of claims that a city has a policy of failing to train its police officers. He stated:

> [T]he type of policy upon which respondent replies [failure to train], and its causal relation to the alleged unconstitutional violation, are not susceptible to such easy proof. In the first place, the word "policy" generally implies a course of action consciously chosen from among various alternatives; it is therefore difficult in one sense even to accept the submission that someone pursues a "policy" of "inadequate training" unless evidence be adduced which proves that the inadequacies resulted from conscious choice—that is, proof that the policymakers deliberately chose a training program which could prove inadequate. And in the second place, some limitation must be placed on establishing municipal liability through policies that are not themselves unconstitutional, or the test set out in *Monell* will become a dead letter ... [W]here the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the "policy" and the constitutional deprivation.

*Tuttle,* 471 U.S. at 823–24, 105 S.Ct. at 2436, 85 L.Ed.2d at 803–04 (footnotes omitted).

In a footnote to the above cited text, the Court added the following language that is relevant here:

> We express no opinion on whether a policy that itself is not unconstitutional, such as the general "inadequate training" alleged here, can even meet the "policy" requirement of *Monell.* In addition, even assuming that such a "policy" would suffice, it is open to question

whether a policymaker's "gross negligence" in establishing police training practices could establish a "policy" that constitutes a "moving force" behind subsequent unconstitutional conduct, or whether a more conscious decision on the part of the policy makers would be required.

*Id.* at 824 n. 7, 105 S.Ct. at 2436 n. 7, 85 L.Ed.2d at 804 n. 7. *See also* the discussion of the *Tuttle* footnote in *Grandstaff v. City of Borger*, 767 F.2d 161, 169–70 (5th Cir.1985). Therefore, the Court may require briefing on this point prior to trial.

## IV. *Conclusion*

For the foregoing reasons, defendants' motion for summary judgment is DENIED. This case represents a somewhat novel application of § 1983, requiring from counsel their best efforts at understanding and applying this ever-changing body of law. With the facts so hotly in dispute and the law in such a state of change, the Court is unable to grant summary judgment. If, however, the facts as they develop at trial do not support plaintiffs' case, motions for directed verdict will be entertained. The Court encourages the parties to submit trial briefs at the proper time to aid the Court in handling the various issues which will arise.