**Thomas P. MOYER, Lyle A. Moyer and Margaret H. Moyer, Plaintiffs,**

v.

**DUNN COUNTY, Village of Colfax, Ronald W. Hodgson, James A. Nosker, Charles Owen, General Casualty Company of Wisconsin, and Hartford Insurance Group, Defendants.**

No. 87–C–169–C.

United States District Court, W.D. Wisconsin.

July 21, 1988.

Dana John Wachs, Wachs & Wachs, Eau Claire, Wis., John L. Cates, Lawton & Cates, Madison, Wis., for plaintiffs.

Harry Sauthoff, Jr., Sauthoff, Alexander & Mindt, Carroll Metzner, Madison, Wis., William A. Schembera, Thedinga Law Firm, Menomonie, Wis., for defendants.

## ORDER

CRABB, Chief Judge.

In this civil action for money damages plaintiffs claim that defendants Dunn County, Village of Colfax, and Hodgson, Nosker, and Owen violated plaintiff Thomas Moyer's rights under the Fourth and Fourteenth Amendments when they engaged in a high-speed pursuit of Moyer that ended in Moyer's losing control of his motorcycle and crashing.[1] Jurisdiction is present under 28 U.S.C. § 1331. Now before the court are defendants' motion for summary judgment and their motion to strike Exhibit I of the affidavit of John Cates, Dkt. # 137a. I will grant defendants' motion to strike. However, because I find that there is a genuine issue as to the manner in which defendants Nosker and Owen pursued plaintiff, I will deny defendants' motion as to plaintiff's Fourteenth Amendment claim of excessive force, and plaintiffs' state law claim of negligence.

Based on the parties' proposed findings and for purposes only of deciding this motion, I find that there is no genuine issue as to the following material facts.[2]

### Undisputed Facts

Plaintiff Thomas P. Moyer is an adult residing at R.R. 1, Box 97, Colfax, Wisconsin. Plaintiffs Lyle A. and Margaret H. Moyer reside at the same address and are the natural parents of Thomas Moyer.

Defendants Dunn County and Village of Colfax are duly authorized governmental subdivisions of the State of Wisconsin.

Defendant Hodgson resides in Wisconsin. At all times material to this action, he was employed as the chief of police of defendant Village of Colfax.

Defendant Nosker resides in Wisconsin. At all times material to this action, he was employed in defendant Village of Colfax as a police officer.

Defendant Owen resides in Wisconsin and at all times material to this action was employed as a deputy sheriff in defendant Dunn County.

At all times material to this action, defendant General Casualty Company of Wisconsin was an insurance company doing business in the State of Wisconsin and had a policy of liability insurance issued to defendant Dunn County.

At all times material to this action, defendant Hartford Insurance Group was an insurance company doing business in the State of Wisconsin and had a policy of liability insurance issued to defendant Village of Colfax.

In the early morning hours of May 28, 1986, defendants Nosker, Hodgson, and Owen, and extra police officer Jones Jordan were parked in Larson's garage, which is located in the village of Colfax. While the officers were conversing, defendant Nosker noticed several vehicles drive by on Main Street, including a motorcycle heading south on Main Street. The police officers at Larson's observed the color of the motorcycle and the hair color of the rider. Defendant Nosker observed also an older motor vehicle drive by Larson's garage

---

1. In their second amended complaint, plaintiffs alleged that defendants violated Thomas Moyer's rights under the Fourth, Fourteenth, and Sixth Amendments. None of the allegations in the complaint supports a Sixth Amendment claim, nor do plaintiffs press this claim in their opposition to defendants' motion for summary judgment.

2. I note that although plaintiffs dispute a number of defendants' proposed findings, they do not comply with this court's rules for summary judgment motions by citing to the record in support of their objections. Likewise, defendants Village of Colfax, Hodgson, Nosker and Hartford Insurance Groups do not support their objections to plaintiff's proposed findings of fact. I have not taken unsupported objections into account in making findings of fact. Where the parties supported their objections to proposed findings of fact, I have included the facts under the heading "Disputed Facts."

without its lights on. He decided to stop the vehicle for the purpose of talking to its operator. In order to pull out of Larson's garage, defendant Nosker was required to back out onto First Street and to stop his car at the intersection of First Street and Main Street, which is Highway 40. Prior to entering Highway 40, defendant Nosker yielded to a motorcycle traveling in an easterly direction on Highway 40. It was the same motorcycle defendant Nosker had just seen heading south on Main Street. The motorcycle was traveling in the same direction as the motor vehicle previously observed by defendant Nosker.

Defendant Nosker made a right-hand turn onto Highway 40 behind the motorcycle. He turned on his flashing red and blue lights and his left directional signal in an attempt to pass the motorcycle. At that point, the motorcycle accelerated suddenly. Defendant Nosker pulled in behind it and turned on his siren. The motorcycle slowed down and pulled over to the right-hand gutter in order to negotiate a right-hand curve on Highway 40. After clearing the curve, the motorcycle accelerated again and a high speed pursuit began. Defendant Nosker pursued the motorcycle at speeds approaching 100 m.p.h.

The motor vehicle without its lights on was parked six-tenths of a mile down the road when the chase began.

Plaintiff was the driver of the motorcycle, which was owned by Faron Flatland. On the evening of May 27, plaintiff had gone to meet some friends for the purpose of planning a fishing trip to Canada. Plaintiff was seventeen years old. He arrived at the meeting with Faron Flatland on Flatland's motorcycle. Sometime after midnight, plaintiff decided to look for Flatland because he wanted Flatland to take him home. He got onto Flatland's motorcycle and headed into Colfax. Plaintiff drove past his girl friend's house and Larson's service station. He was driving approximately 25 m.p.h. Plaintiff was not wearing a helmet. As he drove past Larson's, plaintiff saw defendants Nosker and Owen in the parking lot. Plaintiff had no difficulty observing and identifying defend-

ant Nosker. He continued down Main Street for approximately seven-tenths of a mile to the Viking Bowl. Approximately one block south of Larson's, plaintiff passed Wendy Larson, who was heading in the opposite direction. Wendy Larson had no difficulty observing and identifying plaintiff as he drove by on the motorcycle. When plaintiff reached the Viking Bowl, he turned around and headed back into town in a northerly direction on Highway 40. He was travelling at the posted speed limit of 25 m.p.h.

Main Street has numerous street lights and is well lit at night. As plaintiff drove north on Highway 40 (Main Street), past Larson's service station, defendants Owen and Nosker were still there. Plaintiff passed Wendy Larson and Rebecca Raven, who were pulling away from the curb in a northerly direction, one block south of Larson's station. Wendy Larson had no difficulty observing and identifying Moyer. Larson and Raven drove their cars past Larson's service station and saw the police officers. They drove to 802 University Avenue, parked their cars and began to get out. Larson saw two squad cars pursuing plaintiff at the corner where Highway 40 turns from the North to the East. This corner is approximately one-half mile from 802 University Avenue.

Plaintiff continued north on Highway 40 over the bridge that is located one block north of Larson's, and around the corner onto University Avenue, which is about two blocks from Larson's service station.

Defendants Owen and Nosker pulled out after plaintiff at approximately the same time. Defendant Nosker obtained plaintiff's license plate number just outside the village limits.

As plaintiff turned the corner to head east on Highway 40, he noticed a squad car behind him and following him. Plaintiff could have stopped for defendant Nosker's police vehicle, but he panicked and accelerated because he did not have a motorcycle endorsement and did not want to get a ticket. Plaintiff was aware that defendant Nosker wanted him to stop. Defendant

Owen had chased plaintiff for one to two weeks in the fall of 1985.

At the intersection of County Trunk A and Highway 40, defendant Nosker was required to brake his vehicle and turn the wheel in order to avoid striking the motorcycle. His car began to shimmy, and at the Chippewa County Line, he requested that defendant Owen, who had joined the pursuit, take over. The distance between Larson's garage and the Chippewa County Line is 3.9 miles. Defendant Owen flashed his highbeams on and off and activated his emergency lights and siren. He radioed that he was not pushing the motorcycle and that he was letting the motorcycle dictate the speed of the chase.

Plaintiff does not recall that he was pursued by two squad cars, or that one car had passed the other. He was not aware that defendant Owen was engaged in his pursuit.

At one point, plaintiff was able to see the tail lights of his motorcycle reflected in the grille of the police vehicle behind him.

Defendants Owen and Nosker continued the chase although they knew plaintiff was having trouble handling the motorcycle and would crash if he kept driving in the same manner. Defendants knew that plaintiff was the driver.

The chase proceeded into Chippewa County and from Highway 40 onto Town Hall Road. At that point, defendant Owen was approximately 30 yards behind the motorcycle. Plaintiff entered a curve, and at that point defendant Owen was approximately 15–30 feet behind him. As plaintiff rounded the curve, he lost control of his motorcycle and left the road. The accident occurred at 12:55 a.m. The distance between Larson's garage and the accident site is 10.4 miles. The pursuit lasted approximately seven minutes. As plaintiff lay semi-comatose on the ground at the site of the accident, defendant Nosker said, "We finally got the little bastard."

Plaintiff was taken to a hospital in Bloomer, Wisconsin. He was immediately transferred from this hospital to Sacred Heart Hospital in Eau Claire, Wisconsin. At the hospital in Eau Claire, defendant

Nosker placed plaintiff under arrest by placing a hand on him and indicating that he was under arrest for operating a vehicle while under the influence of an intoxicant. The arrest occurred at approximately 3:45 a.m. Immediately following the arrest, a blood sample was taken from plaintiff for the purpose of analyzing its ethanol content. Defendant Nosker mailed the blood sample to the medical toxicology section of the State Laboratory of Hygiene in Madison, Wisconsin. The report from the laboratory indicated a blood ethanol level of 0.022% by weight. Subsequently, defendant Nosker issued the following additional citations to plaintiff: no protective headgear in violation of Wisconsin Statutes § 347.485(1)(a); no motorcycle endorsement in violation of § 343.05(1)(a), (b); knowingly fleeing an officer in violation of § 346.04(3). Plaintiff was fined $66.00 for not wearing protective head gear and for not having a motorcycle endorsement.

Plaintiff sustained severe injuries, including permanent brain damage.

Based on the parties' findings of fact, I find that the following facts are disputed.

### Disputed Facts

Defendants Nosker and Owen pursued plaintiff from distances that made it nearly impossible for plaintiff to stop without being hit or run over.

At one point in the pursuit, plaintiff attempted to slow down and was almost run over.

A road block was set up that caused plaintiff to leave the road and crash.

### Opinion

■ I turn first to defendants' motion to strike Exhibit I of the affidavit of John Cates. Exhibit I contains portions of the deposition of Harvey Knowlton, in which he testified that on the night of plaintiff Thomas Moyer's accident, he had heard on his police scanner two police officers discussing the pursuit of a young man on a motorcycle. The officers did not identify themselves or the person they were chasing. Knowlton testified that at one point

he remembered one of the officers saying that "we'd better block this boy because he knows these back roads much better than us...." Later, according to Knowlton's testimony, one of the officers said "I think we have got him blocked so that he can't get around us." Plaintiffs cite to the Knowlton deposition to support their finding that defendants used a roadblock to attempt to stop Moyer. Defendants object to the use of this deposition on the grounds of lack of foundation and hearsay.

I note initially that there was no mention of a roadblock either in plaintiffs' original or in their amended complaint. The only other support offered for the finding that defendants used a roadblock is plaintiff Thomas Moyer's deposition, in which Moyer testified that as he rounded the last curve before leaving the road, he saw a car in the center of the road coming towards him. Even if I were to admit the Knowlton deposition, it would provide at best an inferential support for plaintiffs' proposed finding. Nowhere in the excerpt from Knowlton's deposition does Knowlton say that the officers spoke of a "roadblock."

However, I agree with defendants that plaintiffs have not provided adequate foundation to establish that the officers heard by Knowlton were defendants Nosker and Owen. The burden is upon plaintiffs to show that Knowlton had first-hand knowledge of the fact plaintiffs are attempting to prove with the help of Knowlton's testimony: that defendants used a roadblock. *See* E. Cleary, McCormick on Evidence § 10 at 24 (3d ed. 1984). Plaintiffs have not met this burden. According to Rule 602, Federal Rules of Evidence, a "witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Accordingly, defendants' motion to strike Exhibit I will be granted.

A district court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine isse as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Federal Rules of Civil Procedures. "The mere existence of a factual dispute will not bar summary judgment unless 'the disputed fact is outcome determinative under governing law.'" *Howland v. Kilquist*, 833 F.2d 639, 642 (7th Cir.1987) (quoting *Egger v. Phillips*, 710 F.2d 292, 296 (7th Cir.) (en banc), *cert. denied*, 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983)).

*1. The Fourth Amendment Claim*

Plaintiffs claim that defendants Nosker and Owen unreasonably seized plaintiff Thomas Moyer in violation of his Fourth Amendment rights. According to plaintiffs, when defendant Nosker pulled out behind Moyer, neither he nor defendant Owen had any reason to suspect Thomas Moyer of engaging in illegal activity. Nor did defendants Nosker and Owen have any reason to engage in a high speed pursuit of Moyer, at least not in the manner in which plaintiffs allege Nosker and Owen conducted the pursuit. In effect, plaintiffs argue that two seizures occurred: the first occurred when defendants decided to follow Moyer and the second when they chased him at high speeds.

Defendants argue that a completed seizure of Thomas Moyer never occurred, and therefore it is unnecessary to consider the reasonableness of defendants Nosker and Owens' conduct.

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures ..." Not every encounter between a police officer and a citizen amounts to a seizure, however, *United States v. Mendenhall*, 446 U.S. 544, 553, 100 S.Ct. 1870, 1876–77, 64 L.Ed.2d 497 (1980), and there is no foundation for invoking the Fourth Amendment if no seizure has occurred. *Id.* In *Mendenhall*, the Supreme Court defined seizure as the point at which, "by means of physical force or a show of authority, [an individual's] freedom of movement is restrained." *See also Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968). The Court conclud-

ed that a person has been seized within the meaning of the Fourth Amendment "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877.

■ In this case, plaintiffs appear to argue that since a reasonable person would have felt that he or she had no choice but to pull over when defendant Nosker flashed his lights, defendant Nosker "seized" Thomas Moyer at that moment, even though Moyer behaved unreasonably by failing to stop.[3] They argue further that defendants had no articulable reason to seize Moyer. I have found that when defendant Nosker pulled out of Larson's gas station after Moyer (or the older motor vehicle), Moyer was traveling at the posted speed limit. Moyer was arrested for failure to wear protective headgear and for having no motorcycle endorsement. Thus, based on the facts, the lack of protective headgear was the only reason defendant Nosker might have had to stop Moyer, unless he had reason to suspect that Moyer did not own the motorcycle he was riding.

The Court's definition of seizure in *Mendenhall* is not entirely helpful in the context of the attempted stop of a motor vehicle. There is little doubt that when police stop an automobile, a seizure has occurred. *See* W. LaFave, Search and Seizure § 9.2(h) at 417 (2d ed. 1987). Short of an actual stop, however, it is more difficult to assess when a seizure has occurred. In *Mendenhall*, the Supreme Court reviewed the trial court's denial of a motion to suppress evidence obtained during a strip search of the defendant. It upheld the trial court's decision because it found that the defendant cooperated voluntarily with agents who ap-

proached her in an airport and proceeded to ask her questions. Under the circumstances of the case, the Court held, a reasonable person would not have felt that he or she had no choice but to answer the agents' questions and to accompany them. Thus, in *Mendenhall*, the Court developed a definition of seizure in the context of its attempt to distinguish between voluntary cooperation with police officers and coerced participation in police investigation. The *Mendenhall* definition is not particularly helpful in cases where individuals do not participate at *all*, whether voluntarily or involuntarily. *See Michigan v. Chesternut*, — U.S. —, —, 108 S.Ct. 1975, 1978–80, 100 L.Ed.2d 565 (1988) (*Mendenhall* test is "necessarily imprecise")[4]

Similarly unhelpful is the definition of seizure provided in *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), a case cited by plaintiffs. Although in that case the Court defined seizure in the context of automobile stops, it dealt with a situation in which the motorist complied with the officer's signal to pull off the road. Under these circumstances, the Court found that the "Fourth and Fourteenth Amendments are implicated ... because *stopping* an automobile and *detaining* its occupants constitute a "seizure" within the meaning of those Amendments...." *Id.* at 653, 99 S.Ct. at 1396 (emphasis added).

As the court recognized in *United States v. Black*, 675 F.2d 129, 134 (7th Cir.1982), the question whether a seizure has occurred is a "highly factual" one. The facts of *Mendenhall* and *Delaware v. Prouse* cannot be readily superimposed on the facts of this case. Nevertheless, courts have found that when police officers turn

---

**3.** Although it has not been properly documented as such, there appears to be a dispute whether defendant Nosker's flashing lights were directed initially at Moyer or, as defendants allege, at the older motor vehicle without its headlights on. Because I find that Moyer's decision to accelerate constituted an intervening and superseding act, I will proceed to analyze the initial stage of the pursuit under the assumption that defendant Nosker pulled out behind plaintiff and turned on only his flashing lights, and not his left

signal, as if to indicate that he was pursuing another vehicle.

**4.** However, in *Michigan v. Chesternut*, the Court made clear that a seizure can occur even when an individual is not literally restrained, or stopped, by police officers. — U.S. at —, 108 S.Ct. at 1978–80 (attempt to argue that there is no seizure short of successful attempt to apprehend individual fails to heed Court's "reasonable man" definition).

on their flashing lights, they have crossed the boundary between a request for cooperation and an order to stop, and that it is the "order" that constitutes the seizure, rather than the actual stop. *See, e.g., State v. Indvik,* 382 N.W.2d 623, 627 (N.D.1986) ("When a police officer turns on his flashing red lights it constitutes the first step in the "stop" and the driver must make a decision. Few motorists can ignore or disobey a directive to pull over."); *Michigan v. Chesternut,* —— U.S. at ——, 108 S.Ct. at 1978–80 (suggesting that activation of siren or flashing lights might constitute a seizure). As the court stated in *United States v. Black,* 675 F.2d at 134–135: "[I]f officers have intimidated an individual through the use of a show of authority sufficient to make it apparent that the individual is not free to ignore the officer and proceed on his way, a seizure will be found." Although plaintiff chose not to obey defendant Nosker's flashing lights, he cannot be said to have ignored them. I have found as a fact that plaintiff knew that defendant Nosker wanted him to stop.

Once a court establishes that a seizure has taken place, it must ask whether the seizure was a reasonable one. *Galas v. McKee,* 801 F.2d 200, 202 (6th Cir.1986) (employing two-step analysis in determining whether plaintiff's Fourth Amendment rights were violated). But Moyer's decision to accelerate suspends the analysis of the reasonableness of defendant Nosker's decision to stop Moyer (assuming, for the purpose of this opinion, that defendant Nosker decided to signal Moyer to stop, and not the older motor vehicle). Even if defendant Nosker's flashing lights constituted a seizure for purposes of the Fourth Amendment, and even if defendant Nosker did not have reasonable grounds for signaling Moyer to stop, Moyer's decision to accelerate gave defendant Nosker a legitimate reason to pursue him. *See State v. Indvik,* 382 N.W.2d at 627 (motorist's "independent and intervening" action of engaging officer in a high-speed chase dissipated the taint of prior illegality, where

officer had insufficient reason to attempt initially to stop motorist). Therefore, I turn next to plaintiff's contention that the high-speed pursuit of Thomas Moyer constituted an unreasonable seizure.

■ Plaintiffs argue that defendants Nosker and Owens' manner of pursuing Moyer constituted the unreasonable use of deadly force under *Tennessee v. Garner,* 417 U.S. 1, 94 S.Ct. 2074, 40 L.Ed.2d 612 (1985). In that case, the Supreme Court held that stopping a fleeing burglary suspect by shooting him dead was a seizure, and that it was not justified where the officers had no reason to suspect that the suspect had committed a violent crime or that he posed a danger to them or to others. Plaintiffs allege that defendants Nosker and Owens pursued Moyer at such high speeds and so closely that had Moyer stopped or slowed down, they would have collided with him. In effect, plaintiffs argue that the way in which defendants Nosker and Owen conducted the pursuit was no different from firing a weapon at a fleeing suspect. Because defendants had no reason to suspect Moyer of having committed a violent crime, their use of deadly force was unreasonable.

At least one court has rejected the analogy between a high-speed pursuit and the use of deadly weapons. In *Tagstrom v. Pottebaum,* 668 F.Supp. 1269 (N.D.Iowa 1987), the plaintiff had engaged in a high-speed pursuit with police officers that resulted in his losing control of his motorcycle and colliding with a pick-up truck. The plaintiff argued that high-speed pursuits constitute the use of deadly force and that it was unreasonable to use deadly force against a traffic violator.[5] But the court read *Tennessee v. Garner* narrowly to apply only to the *successful* use of deadly force, rather than to the *potentially* dangerous use of force. Thus, it found that the high-speed pursuit of Tagstrom did not amount to a seizure under *Tennessee v. Garner,* and that it was not necessary to consider the reasonableness of the pursuit.

---

**5.** In *Tagstrom,* the police officer had observed the plaintiff drive through a stop sign without stopping and without his headlights.

*See also Galas v. McKee,* 801 F.2d 200 (declining to apply *Garner* because high-speed pursuit does not involve use of physical force).[6]

Although the language of *Tennessee v. Garner* seems to support a narrow reading, other courts have held that it encompasses non-deadly uses of force. *Lester v. City of Chicago,* 830 F.2d 706, 711 (7th Cir.1987) (*Garner's* Fourth Amendment analysis "applies to all excessive force in arrest claims, not just claims that police used deadly force"); *Jamieson v. Shaw,* 772 F.2d 1205, 1209 (5th Cir.1985) (citing *Garner* for proposition that Fourth Amendment limits the level of force that may be used to accomplish the seizure of a person). Moreover, even under a literal reading of *Garner,* there may be little meaningful difference between the use of deadly weapons and high-speed pursuits that subject the pursued motorist either to collision with squad cars or to the consequences of driving off the road at high speed. *See Galas v. McKee,* 801 F.2d at 203 (danger posed by high-speed pursuits makes them "no different than [sic] the use of firearms to apprehend fleeing suspects"). In *Tagstrom v. Pottebaum,* the court rejected the argument that high-speed pursuits were deadly weapons *per se,* but it hinted that under certain circumstances, such pursuits might fall under *Garner:* "The pursuit, by itself, did not limit the plaintiff's ability to protect himself from harm in the same way in which a shot or attempt to run him down would limit that ability. *At all times the plaintiff retained the ability to lower or eliminate the risk of injury by slowing down or stopping." Tagstrom v. Pottebaum,* 668 F.Supp. at 1273 (emphasis added). *See also Michigan v. Chesternut,* —— U.S. at ——, 108 S.Ct. at 1978–80 (suggesting—in context of police car's pursuit of individual on foot—that seizure might occur where law enforcement officers operate a car "in an aggressive manner to block [an individual's] course *or otherwise con-*trol the direction or speed of his movement,") (emphasis added); *Easterling v. City of Glenville,* 694 F.Supp. 911 (S.D.Ga. 1986) (suggesting that plaintiffs might prove defendants' recklessness in continuing high-speed pursuit when they knew plaintiffs' decedent and could have arrested him at a later time).

█ Plaintiffs attempt to rescue their Fourth Amendment argument through the window left open in *Tagstrom.* They assert that there is a genuine factual issue concerning whether Moyer had the ability to lower or eliminate his risk of injury by slowing down. Plaintiffs support this claim by citing to the depositions of several eye witnesses to the pursuit who testified to the short distance between Moyer's car and the squad cars, and to the deposition of Keith Noll, who testified that defendant Nosker told him at some point after the accident that he had had to hit his brakes to avoid running into Moyer.[7] Plaintiffs cite also the deposition of Thomas Moyer, who testified that he attempted at one point in the pursuit to slow down, and that the squad car behind him nearly ran into him. Plaintiffs' support for their argument concerning the manner in which the pursuit was conducted is rather slim, but a reasonable jury could find that Moyer did not have the realistic possibility to slow down and stop once the pursuit began, and that defendants Nosker and Owen were responsible for foreclosing that possibility. Thus, a reasonable jury could find that defendants Nosker and Owen effectively seized Moyer at the point at which the pursuit could end only with Moyer's injury, whether the injury's most immediate cause was Moyer's loss of control of his motorcycle or his collision with defendants' cars. Accordingly, I will deny defendants' motion regarding plaintiffs' claim that the high-speed pursuit of Thomas Moyer amounted

---

6. In *Tagstrom,* the court rejected plaintiff's argument that high-speed pursuits constitute excessive force under the Fourteenth Amendment. Plaintiffs make a similar claim, which I address in Part 2 of this opinion.

7. Although this testimony is hearsay, it is arguably admissible as an admission against interest under Rule 804(b)(3), Federal Rules of Evidence.

to a seizure under the Fourth Amendment.[8] Because the determination whether the pursuit was a seizure depends upon the resolution of a factual dispute, it would be premature to determine at this stage whether such a seizure was reasonable under the circumstances.

### 2. The Fourteenth Amendment Claim

■ Plaintiffs argue that even if a seizure did not occur, they may make a claim against defendants for use of excessive force under the Fourteenth Amendment. Defendants respond that after the decision in *Lester v. City of Chicago*, 830 F.2d 706, which is binding on this court, *all* excessive force claims must be analyzed under the Fourth Amendment. Thus, if there was no seizure, plaintiffs do not have a constitutional claim.

In *Lester v. City of Chicago*, the court did not have to consider the question whether a seizure had occurred. It was clear from either party's version of the facts that the plaintiff had been seized by the police. The question before the court in *Lester* was what standard to use in determining whether the police used excessive force in seizing the plaintiff. The court did not express a "view as to the viability of substantive due process other than in excessive force *in arrest* claims. Likewise, [it did] not address the proper standard for analyzing claims of excessive force by state officers in other situations, such as pretrial detention." *Id.* at 713 n. 7 (citing *Johnson v. Glick*, 481 F.2d 1028 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)) Presumably, the standard to be used in determining a Fourteenth Amendment claim of excessive force in a context other than that of a seizure or arrest would be the standard enunciated in *Johnson v. Glick*, 481 F.2d 1028.[9]

Of course, in this case, if it is determined at trial that Moyer had the possibility of slowing down or else safely evading defendants Nosker and Owens (and thereby evading seizure), plaintiffs will have a very weak claim under the Fourteenth Amendment. I agree with the courts in *Galas* and *Tagstrom* that it is not unreasonable as such for officers to pursue a motor vehicle whose driver chooses to elude police officers at high speeds. *See Galas v. McKee*, 801 F.2d at 204 (high-speed chases are "longstanding police practice" that court considers "essential to a coherent

---

8. Defendants argue that plaintiffs' allegations regarding the closeness of the pursuit go to the *reasonableness* of the seizure, and not to the threshold question whether the pursuit amounted to a seizure. Under the deadly force analysis urged by plaintiffs, however, the *manner* in which defendants Nosker and Owens conducted the high-speed pursuit *was* the seizure. The reasonableness of the pursuit must then be determined by asking whether the need to apprehend a motorist who suddenly accelerates and disregards the speed limit justifies pursuing him in such a way that he has no choice but to collide with the pursuing car or to crash. In other words, under *Garner*, the manner in which force is used goes to both prongs of a Fourth Amendment analysis: was there a seizure? and was it reasonable?

In the principal cases relied upon by defendants, *Galas v. McKee*, 801 F.2d 200, and *Cameron v. City of Pontiac*, 813 F.2d 782 (6th Cir. 1987), the courts were not presented with the question whether high-speed pursuits can ever be conducted in such a manner as to render them seizures under *Tennessee v. Garner*. Like *Tagstrom v. Pottebaum*, *Galas* and *Cameron* deal only with the question whether high-speed pursuits are seizures *per se*.

9. In *Johnson v. Glick*, Judge Friendly listed several factors that courts should consider in determining whether plaintiffs have made out a Fourteenth Amendment claim of excessive force. One of the factors is "the need for the application of force." 481 F.2d at 1033. In this case, the need for a high-speed pursuit might be justified if it were found that the danger of allowing plaintiff to continue unstopped outweighed the risk of injury to plaintiff from the high-speed pursuit. The balancing test implicit in the *Johnson v. Glick* factor is similar to the balancing process discussed in *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1, in the context of the Fourth Amendment. In that case, the Supreme Court held that the intrusiveness of a seizure must be weighed against the governmental interest in effective law enforcement. *Id.* at 9, 105 S.Ct. at 1700. Thus, even a highly intrusive seizure such as the use of deadly force might be justified in circumstances where there is probable cause to believe that the fleeing suspect poses a threat of serious physical harm, either to the officer or others. *Id.* at 11, 105 S.Ct. at 1701.

scheme of police power"). Thus, it will be difficult for plaintiffs to prove that the high-speed pursuit of Moyer was excessive if the jury finds that, in the words of the court in *Tagstrom v. Pottebaum*, he "at all times ... retained the ability to lower or eliminate the risk of injury by slowing down or stopping." *Tagstrom v. Pottebaum*, 668 F.Supp. at 1273. However, at this stage, I cannot conclude as a matter of law that high-speed pursuits can never constitute excessive force. Defendants' motion will be denied as to plaintiffs' Fourteenth Amendment claim.

*3. Pendent State Claim*

■ Plaintiffs assert a state law claim of negligence based on the manner in which the high-speed was conducted. Because I have not granted defendants' motion for summary judgment on the question whether a constitutional violation occurred, I will not grant their motion regarding plaintiffs' state claim under *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed. 2d 218 (1966) (where federal claims are dismissed, court should decline to exercise pendent jurisdiction).

Defendants argue also that plaintiffs' negligence claim is precluded by *Brunette v. Employers Mutual Liability Insurance Co.*, 107 Wis.2d 361, 320 N.W.2d 43 (Ct. App.1982). In that case, the Wisconsin court of appeals upheld the jury's finding that a police car did not intentionally strike the plaintiff's motorcycle in the course of a high-speed pursuit and that the officer engaged in the pursuit was not negligent in the operation of his car. The court found that the plaintiff's negligence in fleeing from police officers was the cause of his accident. "By [the plaintiff's] own admission, he could have stopped at any time after he was aware that Gardner wanted him to stop." *Id.* at 364, 320 N.W.2d 43. Here, Moyer has denied that he was able to stop at any time during the pursuit. The

same set of disputed facts that may distinguish this case from *Galas* and *Tagstrom* distinguishes it from *Brunette*. Accordingly, defendants' motion regarding plaintiffs' state law claim will be denied.[10]

*Order*

IT IS ORDERED that defendants' motion for summary judgment regarding plaintiffs' claims under the Fourth and Fourteenth Amendments and under state law, are DENIED.

---

**10.** Defendants Dunn County and Village of Colfax have not based their motion for summary judgment on the lack of a genuine issue of material fact regarding municipal liability. Instead, they have focused their motion on the question whether a constitutional violation occurred when defendants Nosker and Owens engaged in a high-speed pursuit of Thomas Moyer. Accordingly, I do not address the issue whether defendants Dunn County and Village of Colfax may be held liable even *if* defendants Nosker and Owens violated Moyer's rights.